[No. 13691.   Department Two.   June 20, 1917.]

WILLIAM R. CRAWFORD, *Plaintiff*, v. SEATTLE, RENTON & SOUTHERN RAILWAY COMPANY *et al., Defendants.*[1]

STREET RAILWAYS—USE OF STREETS—FRANCHISE—RIGHT TO COMPENSATION—EVICTION.  Preventing a street railway company from using a street under its franchise during a period in which it was claimed by the city that the franchise had been forfeited, amounts to a partial eviction and suspends the right of the city to collect the two per cent per annum upon the company's gross receipts provided for in the franchise, during the period in question, where the company was thereby put to an expense in excess of the two per cent contracted for; and it is in such case immaterial that the company used other streets under the franchise during the period.

SAME—FRANCHISE—COMPENSATION — DEFENSES — TENDER.  Tender of two per cent of the gross receipts of a street railway, made to a city at a time when it was contending that the company's franchise was forfeited, in an effort to induce the city to comply with the franchise contract, is not a waiver of defenses or an admission that the city was entitled thereto, where it was not accepted by the city.

[1]Reported in 165 Pac. 1070.

Appeal from an order of the superior court for King county, Frater, J., entered July 24, 1916, upon findings in favor of the defendants, rejecting a claim in receivership proceedings for franchise rentals due a city from a street railway corporation. Affirmed.

*Hugh M. Caldwell, Walter F. Meier,* and *George A. Meagher,* for appellant.

*Higgins & Hughes* (*Hyman Zettler,* of counsel), for respondents.

PARKER, J.—The city of Seattle filed in the above entitled action its petition for allowance of its claim against the receivers of the Seattle, Renton and Southern Railway Company appointed therein. The city's claim is for $13,078, being two per cent of the gross receipts of the operation of the lines of the railway company, and is rested upon the provisions of the franchise granted to it by the city. Trial upon the merits in the superior court resulted in findings and judgment denying recovery by the city, from which it has appealed to this court.

During the period here in question, the lines of the railway company were operated by it and its receivers under a franchise granted by the city of Seattle, which contained, among other provisions, the following:

"The grantee, its successors and assigns, shall pay annually to the city of Seattle two per cent per annum of the gross receipts derived from the operation of said railways from and after the date of the acceptance of this franchise until its expiration, . . . Said payments shall be made on the 15th day of January of each and every year for the year preceding. . . ."

Assuming that the railway lines were operated under and in full enjoyment of this franchise without interference by the city authorities, during the period from January 1, 1912, to March 4, 1915, there became due from the company and its receivers to the city the sum of $13,078, no part of which

has been paid.  At the time of granting the franchise, because of the prospective regrading of Dearborn street, over which one of the lines contemplated by the franchise was to be constructed and operated, the railway company was temporarily permitted by the city to maintain a line upon King street, the line upon Dearborn street to be constructed as soon as that street would be regraded.  On December 23, 1910, the city passed an ordinance purporting to repeal and forfeit the franchise under which the railway lines were being operated.  This repealing ordinance was decreed void and of no effect by the Federal court sitting in Seattle on March 4, 1915, in an action then pending therein wherein the railway company was plaintiff and the city was defendant.  Prior thereto the court rendered an opinion in accordance with which the decree was entered, which opinion is reported in *Seattle, Renton & Southern R. Co. v. Seattle*, 216 Fed. at page 694.

At all times in question, there was in force in the city a general ordinance making it unlawful for any person or corporation holding a franchise to use or occupy any public street in the city to perform work upon the streets thereunder without first applying for and procuring a permit therefor from the board of public works.  During the period from January 1, 1912, to March 4, 1915, the railway company and its receivers were prevented by the city authorities from constructing any tracks looking to the operation of a line of railway upon Dearborn street, though they had duly made application for permits to proceed with the construction of that line as contemplated by the franchise ordinance, and during all of that period Dearborn street had been regraded and was physically ready for the construction of the railway line thereon.  The refusal of the city authorities to allow the railway company or its receivers to so proceed was because of the contention of the city that the railway company's franchise had been forfeited and that it had no right to occupy any of the streets of the city with its railway lines.

During this period the railway company was compelled to continue to maintain its temporary line upon King street, which, by reason of conditions attending the operation of the line there, resulted in the railway company being under the necessity of expending more than $1,500 per month in excess of what it would have cost to maintain its lines upon Dearborn street, so that the railway company, during the period of approximately thirty-eight months, incurred an expense of over $56,000 more than it would have incurred in the operation of a line upon Dearborn street, had it been permitted to do so as its franchise contemplated. In January, 1913, and January, 1914, the receivers of the railway company tendered to the city sums equal to two per cent of the gross receipts derived from the operation of the railway lines for the years 1912 and 1913, respectively. These tenders were refused by the city, they being made at a time when the city was contending that the franchise of the railway company had been forfeited.

It is contended in the city's behalf that neither the railway company nor its receivers should be permitted to avail themselves of the defense of the refusal of the city to permit the construction of the railway line on Dearborn street, because there was not sufficient showing that the railway company or its receivers were ready, willing and able to construct that line. This contention, we think, is wholly without merit. As well said by counsel for the receivers, the city "is seeking to recover on a contract when it admits that it was not only unwilling to perform its part of the contract but positively refused to do so." Even if it were necessary for the receivers to affirmatively show willingness and ability on the part of the railway company and on their part to build the line on Dearborn street, the record, we think, makes sufficient *prima facie* showing in that regard. It is possible that, in the latter part of the period in question when the receivership was about to be wound up, it might then not have been practical for the receivers to proceed with the construction

of the line on Dearborn street.   But even if this be true, we think the city is not in a position to now take advantage of that fact.   Indeed, the amount of loss resulting to the railway company and the receivers because of being compelled to operate the line on King street instead of Dearborn street argues that the city was in no small degree responsible for whatever lack of ability there may have been on the part of the receivers to construct the line upon Dearborn street during the latter part of the period in question.

It is contended by counsel for the city that the continued operation of the King street and other lines of the railway system was such an enjoyment of the franchise that the railway company and its receivers should not be permitted to resist payment of the city's claim upon the ground of being prevented from enjoying the use of Dearborn street.   We think this contention is answered in substance by the decision of the supreme court of Missouri in *National Subway Co. v. St. Louis*, 169 Mo. 319, 69 S. W. 290.   The city had granted franchise rights to the subway company to construct and operate electric conduits in the streets, the company being obligated, as one of the conditions of the franchise, to pay the city certain sums semi-annually.   The city authorities becoming of the opinion that the franchise ordinance was void, sought to revoke it and denied the company the right to occupy the streets thereunder.   The validity of the franchise having been established in the courts, the city sought to collect the semi-annual installments from the company during the whole life of the franchise, including the period when the company had been deprived of its rights thereunder. Denying the claimed right of the city to collect the semi-annual installments for the period when the company's full enjoyment of its franchise was prevented by the city, Justice Marshall, speaking for the court, observed:

"The city had the power to make the grant, and to prescribe the terms of the grant.   The result attained was the right to so use the streets by the plaintiff, and the right of

the city to exact the semi-annual payments for the exercise of the right granted. The rights and duties of the parties were therefore mutual and interdependent. The city had no right to the money except as compensation for the enjoyment and exercise of the right granted, and the plaintiff was bound to pay only in case it was allowed to exercise and enjoy the right granted. The plaintiff could not, of course, avoid payment by a voluntary nonuser of the right, nor could the city deny the right and still insist upon compensation for the exercise of the right denied. Such a position would be inconsistent and unconscionable."

After making some further observations likening the position of the company to that of a tenant of the city, Justice Marshall concluded the opinion as follows:

"The city is the landlord and the plaintiff is the tenant. The tenant's quiet enjoyment was interrupted and its possession taken away by the landlord, and therefore its obligation to pay the rent ceased while and as long as such eviction lasted, but sprung into existence again as soon as the enjoyment was restored. Hence, the city had no right to demand or exact the semi-annual payments during the time the city prevented the plaintiff from enjoying the rights conferred by the ordinances."

That case is exactly like this except that there was apparently an entire prevention of enjoyment of the franchise in that case, while in this case the prevention of enjoyment of the franchise was only partial. That an eviction of some substantial part of leased premises suspends the right of the landlord to collect rent, even though the tenant remains in possession of other portions of the premises, is well settled by the authorities. In *Smith v. McEnany*, 170 Mass. 26, 48 N. E. 781, 64 Am. St. 272, the subject was reviewed by Justice Holmes, now of the supreme court of the United States, where he said:

"It is settled in this state, in accordance with the law of England, that a wrongful eviction of the tenant by the landlord from a part of the premises suspends the rent under the lease. The main reason which is given for the decisions is,

that the enjoyment of the whole consideration is the foundation of the debt and the condition of the covenant, and that the obligation to pay cannot be apportioned."

In *New York Drygoods Store v. Pabst Brewing Co.*, 112 Fed. 381, Judge Baker, speaking for the seventh Federal circuit court of appeals touching the question of partial eviction as affecting the landlord's right to collect rent, said:

"It is universally agreed by the authorities that the wrongful eviction or ouster of the tenant by the landlord from an appreciable, material, or substantial part of the demised premises suspends the rent reserved under the lease, and will defeat the landlord's right to recover the same. The main reason which is given for the decisions is that the enjoyment of the whole consideration is the foundation of the debt and the condition of the covenant, and that the obligation to pay cannot be apportioned. To permit an apportionment of the rent would be to allow the landlord to take advantage of his own wrong."

It seems quite plain to us that the depriving of the railway company and its receivers of the use of Dearborn street, as provided in the franchise, amounted to a partial eviction and suspended the right of the city to collect the two per cent of the gross income from the operation of the railway during the period in question.

It is further contended in behalf of the city that the tender of payments made by the receivers of two per cent of the gross income which accrued for the years 1912 and 1913 was in effect a waiver of the defense which the receivers here make against the city's claims. We think it is a sufficient answer that those tenders were not accepted. They were made at a time when the city was insisting in the Federal court that the franchise had been forfeited, and manifestly were made by the receivers in an effort to induce the city to comply with the franchise contract and permit the receivers to proceed thereunder, as well as to prevent the possibility of forfeiture of the franchise, then in litigation in

the Federal court. We are quite unable to understand how the city can now have these tenders construed as an admission on the part of the receivers that the city was legally entitled thereto. If there has been any payment and acceptance of the two per cent of the income accruing after March 4, 1915, it seems plain that whatever effect such payments might have as an admission that the city was entitled thereto, they could in no event have the effect of an admission that the city was entitled to any payments accruing prior thereto during the period that the railway company and the receivers were deprived of the use of Dearborn street; in other words, during the period when they were in effect partially evicted. *Morris v. Kettle*, 57 N. J. Law 218, 30 Atl. 879; *Kuschinsky v. Flanigan*, 170 Mich. 245, 136 N. W. 362, Ann. Cas. 1914A 1228, 41 L. R. A. (N. S.) 430.

We are clearly of the opinion that the city is not entitled to recover. The judgment is affirmed.

ELLIS, C. J., MOUNT, FULLERTON, and HOLCOMB, JJ., concur.