[No. 14554.   Department Two.   May 10, 1918.]

WILLIAM R. CRAWFORD, *Plaintiff,* v. SEATTLE, RENTON & SOUTHERN RAILWAY COMPANY *et al., Defendants.*

SCOTT CALHOUN *et al., Respondents and Cross-Appellants,* v. AUGUSTUS S. PEABODY, *Trustee, et al., Appellants.*[1]

RECEIVERS—COMPENSATION—AMOUNT. Two receivers of an interurban railway will be allowed a compensation of $500 per month each, not on a percentage basis which is obsolete, but in view of the amount involved, the obligations attending it, the amount of the bond required, the time spent, labor and skill needed, the fidelity to details, the expedition of administration, and the character of the accounting; it appearing that both the receipts and disbursements were over $1,200,000, the management efficient, much construction work done, and a great deal of important litigation conducted.

Cross-appeals from an order of the superior court for King county, Frater, J., entered July 24, 1917, fixing the compensation of receivers and approving their final accounts.   Reversed.

[1]Reported in 173 Pac. 32.

*Higgins & Hughes (Hyman Zettler,* of counsel), for appellants.

*Scott Calhoun* and *John A. Homer,* for respondents.

Holcomb, J. — This is an appeal by the principal creditors, and also the receivers, of the Seattle, Renton & Southern Railway Company, from an order fixing the receivers' compensation and approving their final accounts.

Various phases of this litigation have been before the courts before. See *Crawford v. Seattle, Renton & Southern R. Co.,* 71 Wash. 77, 127 Pac. 594; 86 Wash. 628, 150 Pac. 1155, L. R. A. 1916D 732; 92 Wash. 670, 159 Pac. 782; 97 Wash. 70, 165 Pac. 1070; 97 Wash. 651, 167 Pac. 44; *Crawford v. Gordon,* 88 Wash. 553, 153 Pac. 363, L. R. A. 1916C 516; *Seattle, R. & S. R. Co. v. Seattle,* 216 Fed. 694.

The principal creditors appealing are the bondholders of the Seattle, Renton & Southern Railway Company. They assign errors of the court below as follows: (1) In allowing receiver Parkin the sum of $7,305, or any sum at all in excess of $21,061.29, theretofore received by him as compensation as receiver; (2) in allowing receiver Calhoun the sum of $7,305, or any sum at all in excess of the $21,083.87 theretofore received by him as compensation as receiver; (3) in approving that portion of the receivers' final accounts which covered the payment to receiver Parkin of the sum of $2,695 in addition to the sum of $366.29 theretofore received by him as compensation as receiver; (4) in approving that portion of the receivers' final accounts which covered the payment to receiver Calhoun of the sum of $2,695 in addition to the sum of $18,-388.87 theretofore received by him as compensation as receiver; (5) in approving the receivers' final accounts without requiring them to return to the trust fund the

amount of the loss they had recklessly and wrongfully inflicted upon that fund by their deposits in the bankrupt Northern Bank & Trust Company.

No assignment of error is made by the receivers on their appeal, but it is contended by them generally that the amount of compensation allowed them is inadequate for the services rendered and that further allowance should be made by this court.

Many assertions are made in the briefs on behalf of the bondholders as to the reckless, wasteful and partisan character of the services for which the receivers were allowed an aggregate of over $56,000 out of the trust funds passing through their hands. It is somewhat bitterly contended by them that the proceedings throughout were unduly delayed by the receivers by reason of their conduct of affairs and of their occasioning much litigation which, the bondholders contend, was unnecessary or unjust; and of their not winding up the receivership much earlier. It is also contended that they acted in collusion with Crawford, the plaintiff in the original proceedings, in various matters to the detriment of the creditors. We shall not concern ourselves greatly with these contentions, but shall deal only with the facts involved. The receivership was instituted upon a complaint of Crawford and these receivers appointed by the state court. They took possession under their appointment on August 31, 1912, and continued the active daily operation, management and control of the properties until June 10, 1916, at which time the property passed to the purchasers under judicial sale thereof. After June 10, 1916, they continued in the possession of the remaining funds in their hands until April 23, 1917, when the hearing in the court below was begun on their final report and petition for discharge, which culminated on July 24, 1917, in an order approving their final accounts and

payments and directing the further payments hereto-
fore referred to in the assignments of error. These
further payments were subject to deductions, in the
case of Parkin, of the sum of $200, money paid to him,
and in the case of Calhoun, $715.75.

The property passing into the hands of the receivers
at the time of their appointment consisted of a street
and interurban electric railway running from Stewart
street, in the city of Seattle, south to Renton, Wash-
ington, a distance between termini of thirteen and one-
half miles. The total cash receipts of the receivers
amounted to $1,249,185.61, and the total disbursements
aggregated $1,207,181.95. Shortly before the sale of
the property, it was appraised by an expert appraiser
of public utilities at the sum of $1,600,000. It was sold
by the receivers in March, 1916, at public auction, at a
minimum price fixed by the court in the sum of $1,-
200,000.

Prior to the time these receivers took possession,
there was a receivership pending in the United States
district court wherein receivers were appointed; but
the state court having obtained jurisdiction first under
the complaint of Crawford, the Federal court relin-
quished jurisdiction and the Federal receivers were
discharged.

At the time the receivers took possession, there was
pending in the state courts certain litigation which they
thereafter conducted, which was ultimately carried to
the supreme court of the United States. There was
also pending an action by the city of Seattle to change
the grades and to condemn a portion of the company's
right of way route. This litigation was also conducted
by the receivers through the lower court to this court,
and a subsequent action was brought by them in the
Federal court to enjoin the city from interfering with
the right of way of the company and for damages, re-

sulting in an award against the city of $41,000. Much litigation was also conducted by the receivers on behalf of the company against the bondholders, through the state and Federal courts. Considerable litigation in the court below was had upon the many claims against the property and against the receivers. Many hearings were had before the public service commission, involving questions within its jurisdiction, and before the city council; all of which, the receivers contend, added to the burdens of their duties and enhanced the value of their services.

It is shown that, at the time the receivers took possession of the property, the right of way, roadbed, and equipment were in a run-down, dangerous and unsafe condition, while the property and equipment, when turned over by the receivers to the purchaser, were in first-class shape in every respect, and no objection has been made to the condition of the road and the equipment as left by the receivers. During their operation of the property, new passenger and freight cars were purchased and paid for, and equipment was purchased for a new sub-station, generators, and apparatus. A considerable amount of regrade work was done during the period of the receivership, which undoubtedly increased the cost of operation materially. The cost of operation per car per mile under the receivers was eighteen cents, while the cost of operating similar properties in the state of Washington runs as high as twenty-eight cents per mile. Much complaint is made by the bondholders as to the cost of the operation under the receivers, but we think this showing alone is sufficient to answer all their complaints.

The compensation allowed by the court below to the two receivers amounts to a little less than $1,200 per month, or a little less than $600 each. Expert witnesses on the question of compensation, on behalf of the bond-

holders, fixed the reasonable compensation of the receivers at from $7,500 or $8,000 to $10,000 per year for both. Expert witnesses, who were perhaps equally competent on the question of compensation on behalf of the receivers, fixed the reasonable compensation that they should receive at from $750 to $1,000 each per month. An operating general manager of an electric railway system, testifying as an expert on behalf of the bondholders, fixed the reasonable compensation to be allowed the general manager and superintendent of the property managed by the receivers at $5,000 per annum, and stated that, in addition to that compensation, such general manager should have a superintendent to look after the details of operation, whose salary should be from $2,500 to $3,500 per annum. This compensation was based by him upon the assumption that the general manager and the superintendent had steady positions, and did not take into consideration the additional responsibility and uncertainty of tenure of receivers. It is incontrovertibly shown that one Mills, a partner in the firm of Peabody, Houghteling & Company, one of the appellants herein, was one of the receivers appointed in the Federal court during the time the receivership was pending there, and testified under oath in the Federal court that a reasonable and fair compensation to be allowed the receivers for the period of the receivership in that court from May 14 to August 29, 1912, was $1,000 per month each for the receivers, of whom there were two, and $1,500 per month for attorney's fees, making a total of $3,500 per month. The order of the Federal court entered August 29, 1912, fixed the compensation of the Federal court receivers at $750 per month, and $750 per month for the attorney. Those receivers did not have charge of the multifarious litigation, much of which was unavoidable,

and the extended operation of the property which the permanent receivers in the state court have had.

It is contended, however, by the bondholders that these receivers were appointed by the state court upon the supposition that Parkin would attend to the operation of the property and Calhoun to the legal business and litigation of the company, and that in all the litigation many other attorneys have been employed and allowed considerable attorneys' fees out of the trust fund for conducting litigation either in association with, or independently of, receiver Calhoun, and that, therefore, receiver Calhoun's services as a receiver had been practically of no benefit to the trust. But the receivers were appointed by the court apparently upon an equal basis and with equal authority and responsibility. There is nothing in this record, and we can conceive of nothing, that divided the duties imposed upon the receivers or the value of their services.

It was shown by the bondholders that receiver Parkin had never received a salary, previous to his appointment as a receiver, greater than $200 per month, and that it is inconceivable that his ability as receiver is more than double his ability in any other employment previously. This is not a proper conclusion either.

"The considerations that should be controlling with the court in fixing compensation [of receivers] are the nature of the matter administered, the amount involved, the obligations attending it, the amount of the bond required, the time spent, the labor and skill needed or expended, the degree of success attained under all circumstances, the fidelity to details, the appreciation evidenced as to the responsibilities of the position, the character of such responsibilities, the expedition with which the trust has been administered in view of results reached, and the method, character, and promptness of the accounting, having regard as a standard, to

what is paid for somewhat similar services in the performance of official duties, *not the standard in private business transactions.* [Italics ours.] The amount of a receiver's compensation does not depend upon the special qualifications or standing, of the person appointed, or the demands made upon his time by private business; nor yet upon the estimates that persons who are themselves in receipt of an ample income may put upon his services from the standpoint they occupy. The value of the services rendered should not be considered generally, but only with reference to the trust administered. Where a receiver is a manager as well as a receiver, his duties and responsibilities are largely increased; and the management of a business like that of a railroad is one of the most difficult and responsible duties that a receiver is charged with. In consequence railroad receivers are usually compensated more liberally than other receivers, although extravagance should be avoided." 34 Cyc. 472.

It is also stated in the same work, at page 474, that,

"A receiver's compensation is sometimes computed by giving a percentage of his receipts and disbursements. In some states the rate of commission is fixed by statute; in others it is regulated by the courts. Five per cent on the amount received and disbursed by a receiver seems to be the customary amount for his compensation."

The five per cent allowance, however, is generally made only where the trust property administered is comparatively small, and where it is comparatively large the courts have reduced the percentage to as low as one per cent unless fixed by statute. 34 Cyc. 474; Beach, Commentaries on Law of Receivers, §§ 759, 766.

Cyc. also states the rule to be in several jurisdictions where there is no statutory compensation for receivers, to follow by analogy the rate of compensation allowed executors, guardians and trustees, and that rate of compensation is urged by the receivers in this case.

But we held in *Tompson v. Huron Lumber Co.*, 5 Wash. 527, 32 Pac. 536, that the percentage method of compensating receivers was obsolete, and refused to follow the basis of compensation fixed by statute in this state for executors and administrators. The railway system was a comparatively short one. The receivers had a somewhat lengthy term.

In view of the fact that the responsibility for conducting the legal proceedings and litigation in which the receivers and the property were involved was in almost every case divided with other attorneys, who received ample compensation out of the funds of the trust, and of the fact that the responsibility for operating properties was divided between two receivers, we can see no just reason for allowing the two receivers any greater sum than $500 each per month for the period during which they actively operated the property, or until June 10, 1916. We think that compensation is ample and just to all the parties, in view of all the conditions of the property and the services of the receivers under the facts before us; and that one-half that sum, or $250 each per month, is an ample allowance to be made to them during the time, after they ceased to control and operate the railway—ten and one-half months—that they had custody and responsibility of the funds remaining in their hands until their submission for final discharge. From these sums are to be deducted the sums which the court found each had received. The amount of loss of funds deposited by the receivers in the Northern Bank & Trust Company is a balance of $5,656.56, and this the receivers admit they are liable for and offer to pay. It will be ordered that they pay that sum into court, or any balance remaining after paying their remaining allowances.

The order appealed from is therefore reversed, with

instructions to enter a judgment in conformity herewith, and the creditor appellants to recover costs of appeal.

ELLIS, C. J., MOUNT, and CHADWICK, JJ., concur.